**Daniel Howard BEE, Plaintiff-Appellant,**

**v.**

**Dr. Keith GREAVES, Medic Keith Hughes and Dr. Robert Greer, Defendants-Appellees.**

**No. 82–1288.**

United States Court of Appeals, Tenth Circuit.

Sept. 24, 1984.

Brian M. Barnard, Salt Lake City, Utah (John W. Porter, Salt Lake City, Utah, with him on the brief), for plaintiff-appellant.

Patricia J. Marlowe, Deputy County Atty., Salt Lake City, Utah (Ted Cannon, Salt Lake County Atty., Salt Lake City, Utah, with her on the brief), for defendants-appellees.

Before HOLLOWAY, SEYMOUR and BOHANON,* Circuit Judges.

SEYMOUR, Circuit Judge.

Daniel Howard Bee filed this action for damages under 42 U.S.C. § 1983 (1976), claiming that employees of the Salt Lake County Jail in Utah administered the antipsychotic drug thorazine to him against his will while he was detained there prior to trial. Defendants include the sheriff, the director of security in the jail, the supervisor of the jail, the jail physician, a psychiatrist employed by Salt Lake County Mental Health, and several county commissioners. Defendants do not deny that Bee was forcibly medicated, but they assert that a variety of state interests justified the procedure. The district court granted summary judgment for defendants. Because we believe there are material, disputed fact issues which preclude summary judgment, we reverse.

## I.

## BACKGROUND

■ When reviewing a summary judgment, we consider the record in the light most favorable to the party opposing the motion, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), and resolve all ambiguities and disagreements in his favor. *Security National Bank v. Belleville Livestock Commission Co.*, 619 F.2d 840, 847 (10th Cir. 1979); *Webb v. Allstate Life Insurance Co.*, 536 F.2d 336, 339–40 (10th Cir.1976). Viewed in this light, the record reflects the following facts.

Plaintiff Bee was booked into the Salt Lake County Jail on August 9, 1980. Within four days, the jail staff had referred him to the mental health staff because he was hallucinating. On August 15, Bee complained to the jail staff because he was not receiving thorazine and threatened to kill himself if the jail refused to provide him with the drug. The jail placed Bee in isolation, and a jail psychiatrist evaluated him. The jail physician prescribed thorazine which Bee took voluntarily at that time.

On August 26, the jail referred Bee to the Utah State Hospital for an evaluation of his competency to stand trial. At the hospital, Dr. Breck Lebegue diagnosed Bee as a schizophrenic and prescribed thorazine for him. The hospital returned Bee to the jail on September 23, and Dr. Lebegue wrote a letter to the state court stating his opinion that Bee was "competent to stand trial at this time in that he has the ability to comprehend the nature of the charges against him and the punishment specified for the offense charged and has the ability to assist his counsel in his defense." Rec., vol. I, at 126. *See also* Utah Code Ann. § 77–15–2 (1982). The next day, the state court declared after a hearing that Bee was competent to stand trial. By a minute order, the court ordered Bee medicated with thorazine each evening.

Bee took thorazine voluntarily until about October 7, when he complained that he was having problems with the drug. Beginning October 16, he refused thorazine treatment for five days. The jail's psychiatrist, Dr. Greer, determined that Bee was "decompensating" as a result.[1] He or-

---

* Honorable Luther L. Bohanon, Senior United States District Judge for the Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

1. It is unclear from the record what "decompensating" means because the evidence of Bee's behavior when Dr. Greer so characterized him is conflicting. Dr. Greer did not remember the incident but testified that, since he ordered an intramuscular injection "stat" (meaning "right away"), he would "reconstruct a picture" as follows. "[H]e would be thrashing around, he would be disoriented, he would be provocative of assault on himself or assaultive of others at this point. That frightened [sic], and would be refusing oral medication." Rec., vol. V, Greer Dep. at 11. In addition to these conjectures by Dr. Greer, there is evidence that Bee had become loud, often calling for the guard. *Id.*, vol. IV, Mower Dep. at 17. On the other hand, the jail medic who actually administered the thorazine injection to Bee, Keith Hughes, testified that Bee was not acting unusual, that he was not "thrashing around, pounding on the tables or anything like that." *Id.*, vol. III, Hughes Dep. at 21. Indeed, when Hughes found Bee, he was either in the day room (a common meeting

dered Bee forcibly medicated with thorazine any time that Bee refused to take his medication orally. On October 21, a jail medic named Keith Hughes and three other jail officers administered Bee's medication forcibly by injection with the express purpose of "intimidat[ing] him so he wouldn't refuse the oral medication anymore." Rec., vol. III, Hughes Dep. at 24. When Bee again refused to take the thorazine on October 23, Hughes and a jail guard threatened Bee with another forcible injection. Confronted with this alternative, Bee acquiesced in an oral dose of thorazine. As late as November 11, more than three

weeks after Bee's initial refusal, the jail staff remained under standing orders to forcibly medicate Bee if he refused the thorazine.[2] Bee took the medicine orally only because of this intimidation.

In the trial court, both sides moved for summary judgment. Bee contended that at best the side effects of antipsychotic drugs such as thorazine are extremely disabling, and that at worst they can inflict serious, permanent injury.[3] Defendants did not dispute the possible side effects of thorazine. In fact, Dr. Greer's deposition testimony tends to support Bee's description of the possible adverse consequences of the

---

area) or in his unlocked and open cell, indicating that Bee was not assaultive or out of control at the time.

2. It is unclear whether Dr. Greer intended to order Bee forcibly medicated for this long a time. At Dr. Greer's deposition, the following exchange took place.

"Q. Now, when you say on that notation, it says [']give repeat.['] What does that mean?

"A. That means they would be able to repeat the i.m. medication [intramuscular injection of thorazine] *once* if he refused the next oral dose .... I would allow them to repeat it *one more time* without checking with me.

"Q. And that is what that notation means? Repeat?

"A. Yes. *To be specific, [it] should be [']repeat times one['] and that isn't there.*"

Rec., vol. V, Greer Dep. at 11 (emphasis supplied).

Regardless of Dr. Greer's intent, however, the jail staff clearly interpreted his notation to mean that Greer authorized them to medicate Bee against his will anytime that he refused oral medication, at least until the staff received different instructions from Greer. Therefore, Bee remained under threat of forcible medication until at least November 11th. He was returned to the state hospital shortly thereafter.

3. Relying on the cited medical authorities, Bee made the following claims about the possible effects of antipsychotic drugs:

"Thorazine is an anti-psychotic medication commonly used to relieve the symptoms of schizophrenia such as thought disorder, blunted affect, indifference, retardation, hallucinations, paranoid identification, hostility and resistiveness. Davis and Cole, Anti-Psychotic Drugs, *Comprehensive Textbook of Psychiatry,* Freedman and Kaplan, pp. 921–940. Although beneficial effects are observed in the treatment of schizophrenia with anti-psychotic medications, the mechanism whereby their therapeutic action is exerted is unknown.

*Physician's Desk Reference,* 1978 pp. 1518 through 1615.

"Serious negative side effects regularly accompany the use of anti-psychotic medications. See Plotkin, 'Limiting the Therapeutic Orgy: Mental Patients' Rights to Refuse Treatment,' 72 Northwestern University Law Review 461 (1977). The most dramatic of the more common side effects produced by antipsychotic medication are known as extrapyramidal disorders. Freedman and Kaplan, *Id.* These are categorized as pseudo-parkinsonisms (mask-like face, tremors, muscle stiffness and rigidity, and shuffling gait), dyskinesia (muscle spasms, especially in the eyes, neck, face and arms, writhing and grimacing movements, protrusions of the tongue) and akathesia (inability to stay still, restlessness and agitation). Other non-muscular side effects include drowsiness, weakness, weight gain, dizziness, fainting, dry mouth and blurred vision.

"The most serious threat that thorazine poses to a patient's health is a condition known as tardive dyskinesia. *Physician's Desk Reference,* p. 1615. Tardive dyskinesia appears in some patients who have undergone long term treatment with anti-psychotic medication or may occur after drug therapy has been discontinued. The syndrome is characterized by rhythmical involuntary movements of the tongue, face, mouth, or jaw. These movements are sometimes accompanied by involuntary movements of one's extremities. There is no known effective treatment for tardive dyskinesia. Plotkin, *id.* The condition is not only severe, but widespread. According to a recent study, 50–56% of hospitalized schizophrenics and 41% of outpatients are afflicted with the condition. Sooner, et al. 'Tardive Dyskinesia and Informed Consent,' March 1978. Psychosomatics 173."

Rec., vol. I, at 203–04.

drug.[4] *See generally, Rennie v. Klein,* 653 F.2d 836, 843–44 (3d Cir.1981) (en banc) (discussing potential adverse side effects of antipsychotic drugs), *vacated and remanded on other grounds,* 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *on remand,* 720 F.2d 266 (3d Cir.1983) (en banc); *Davis v. Hubbard,* 506 F.Supp. 915, 928–29 (N.D.Ohio 1980) (same). *See also Mills v. Rogers,* 457 U.S. 291, 293 n.1, 102 S.Ct. 2442, 2445 n.1, 73 L.Ed.2d 16 (1982). Defendants asserted instead that pretrial detainees have no constitutional right to refuse medical treatment while they are incarcerated. Assuming there is such a right in some circumstances, however, defendants also argued that their actions in medicating Bee were based on legitimate governmental concerns that outweighed any constitutional right Bee might have. The trial judge agreed with defendants and in a short decision from the bench granted summary judgment in their favor.

## II.

## THE RIGHT OF PRETRIAL DETAINEES TO REFUSE ANTIPSYCHOTIC DRUGS

Initially we note the Supreme Court's recognition that pretrial detainees retain certain constitutional rights:

"[W]e have held that convicted prisoners do not forfeit all constitutional protec-

tions by reason of their conviction and confinement in prison.... So, for example, our cases have held that sentenced prisoners enjoy freedom of speech and religion under the First and Fourteenth Amendments, ... that they are protected against invidious discrimination on the basis of race under the Equal Protection Clause of the Fourteenth Amendment, ... and that *they may claim the protection of the Due Process Clause to prevent additional deprivation of life, liberty, or property without due process of law... A fortiori, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners.*"

*Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (citations omitted) (emphasis added). The threshold issue, therefore, is whether pretrial detainees have a constitutional right to refuse treatment with antipsychotic drugs. Bee claims a liberty interest in avoiding the unwanted administration of antipsychotic drugs protected by the Due Process Clause of the Fourteenth Amendment. He grounds the asserted liberty interest in the right to privacy, including the right to make one's own decisions about fundamental matters, the rights to personal dignity and bodily integrity, and the right to communicate ideas freely.[5] We discuss these

4. "Q What other kind of effects are there when someone is receiving Thorazine?

A Well, they get side effects of course, what we call extrapyramidal signs. They develop akathisia, involuntary movements of various kinds, drooling, dry mouth, things like that.

....

A ... If he was in an acutely agitated state and threatening to himself and other [sic], those [extrapyramidal] side effects are the last thing you worry about. Those are not dangerous to the person, they are uncomfortable and over a period of time, they make the patient look weird, so he is estranged from other people, but the extrapyramidal effects are not—there is a variety which is almost the opposite of akathisia where they become hypersensitive (tardive dyskinesia) that is a dangerous form of side effect."

Rec., vol. V, Greer Dep. at 13–15.

5. The Supreme Court reiterated in *Mills v. Rogers,* 457 U.S. 291, 300, 102 S.Ct. 2442, 2449, 73 L.Ed.2d 16 (1982), that a liberty interest may be recognized by a state as well as by the United States Constitution. In that case, the Supreme Judicial Court of Massachusetts recently had recognized a state-created liberty interest in a noninstitutionalized but mentally incompetent person to refuse treatment with antipsychotic drugs. Applying a policy of restraint, the Court remanded the case to the court of appeals to determine whether involuntarily institutionalized mental patients would be accorded a similar liberty interest under state law, a potentially dispositive state law question. The Court thus did not consider whether the plaintiff also had a liberty interest grounded in the Constitution.

In the present case, however, Bee does not argue that Utah would recognize a liberty interest in pretrial detainees to refuse antipsychotic drugs, and we have found no Utah cases that

grounds seriatim. We then consider the competing state interests asserted by defendants which weigh against a pretrial detainee's right to refuse antipsychotic drugs.

### A. The Interest in Avoiding Unwanted Administration of Antipsychotic Drugs

In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court stated that "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), are included in this guarantee of personal privacy." 410 U.S. at 152, 93 S.Ct. at 726. The determination of whether a right is fundamental begins with an examination of " 'the teachings of history [and] solid recognition of the basic values that underlie our society.' " *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (quoting *Griswold v. Connecticut,* 381 U.S. 479, 501, 85 S.Ct. 1678, 1690, 14 L.Ed.2d 510 (1965) (Harlan, J., concurring)).

In *Davis v. Hubbard,* 506 F.Supp. 915, a case challenging the conditions at a state mental institution, the court probed the historical basis of the right to refuse unwanted medical treatments and pointed out that the law of torts has long recognized a person's interest in making decisions about his body. In the context of medical treatment, the court noted that

"treatment by a physician in a non-emergency that is rendered without the patient's informed consent, or [that] exceeds the consent given, is actionable as a battery. *See, e.g., Mohr v. Williams,* 95 Minn. 261, 104 N.W. 12 (1905); *Pratt v. Davis,* 224 Ill. 300, 79 N.E. 562 (1906); *Rolater v. Strain,* 39 Okl. 572, 137 P. 96 (1913); *Schloendorff v. Society of New York Hospitals,* 211 N.Y. 125, 105 N.E. 92 (1914) (Cardozo, J.); *Wells v. Van Nort,* 100 Ohio St. 101, 125 N.E. 910

(1919). The principle which supports the doctrine of informed consent is that only the patient has the right to weigh the risks attending the particular treatment and decide for himself what course of action is best suited for him.

'The very foundation of the doctrine of [informed consent] is every man's right to forego treatment or even cure if it entails what *for him* are intolerable consequences or risks, however warped or perverted his sense of values may be in the eyes of the medical profession, or even of the community, so long as any distortion falls short of what the law regards as incompetency. Individual freedom here is guaranteed only if people are given the right to make choices which would generally be regarded as foolish.'

"2 F. Harper & F. James, Jr., *The Law of Torts* 61 (1968 Supp.) (emphasis in original). *See also, Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 514, 502 P.2d 1, 10 (1972); *Schloendorff v. Society of New York Hospitals, supra,* 105 N.E. at 93."

*Id.* at 931–32 (footnotes omitted). The court in *Davis* concluded that the forced use of antipsychotic drugs represents a significant invasion of an individual's fundamental right to privacy. 506 F.Supp. at 929–30; *accord Rennie v. Klein,* 653 F.2d at 843–44, *vacated and remanded for further consideration,* 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *on remand,* 720 F.2d 266 (3d Cir.1983) (en banc); *Rogers v. Okin,* 634 F.2d 650, 653–54 (1st Cir.1980), *vacated and remanded on other grounds sub nom. Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), *on remand,* 738 F.2d 1 (1st Cir. 1984).

■ The conclusion that an individual has a constitutionally protected interest in making his own decision whether to accept or reject the administration of potentially

address this issue. Under these circumstances, we will consider the federal issues that have been raised. *Cf., Youngberg v. Romeo,* 457 U.S. 307, 316 n. 19, 102 S.Ct. 2452, 2458 n. 19, 73

L.Ed.2d 28 (1982). The parties are not precluded on remand from delineating a state law issue.

dangerous drugs is supported by *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In *Whalen*, Justice Stevens for a unanimous court specifically recognized a privacy interest "in independence in making certain kinds of important decisions." *Id.* at 599–600, 97 S.Ct. at 876. Thus, we agree with the court in *Davis* that the decision whether to accept treatment with antipsychotic drugs is of sufficient importance to fall within this category of privacy interests protected by the Constitution.

The Court recently suggested yet another possible basis for a liberty interest in the instant case. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court reaffirmed that " '[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.' " *Id.* at 316, 102 S.Ct. at 2458 (quoting *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18, 99 S.Ct. 2100, 2109, 60 L.Ed.2d 668 (1979) (Powell, J., concurring in part and dissenting in part)). The Court stated that this interest survives criminal conviction and incarceration. In *Romeo*, a severely retarded man who had been involuntarily committed to a mental institution was subjected to physical soft restraints. If incarcerated individuals retain a liberty interest in freedom from *bodily* restraints of the kind in *Romeo* then a fortiori they have a liberty interest in freedom from physical and mental restraint of the kind potentially imposed by antipsychotic drugs. *See Project Release v. Prevost*, 551 F.Supp. 1298, 1309 (E.D.N.Y. 1982), *aff'd*, 722 F.2d 960 (2d Cir.1983).

The Supreme Court's decision in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), is most pertinent to the present case because it involved the treatment of an allegedly mentally unstable prisoner. There the Court recognized that

" '[a]mong the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.' " *Id.* at 492, 100 S.Ct. at 1263 (quoting *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)). *See also Romeo*, 457 U.S. at 316, 102 S.Ct. at 2458; *Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957). The Court held in part that "[c]ompelled treatment in the form of mandatory behavior modification programs" is a proper factor to be considered in determining whether a prisoner's liberty interest in personal security has been infringed. *Vitek*, 445 U.S. at 492, 100 S.Ct. at 1263. The Court concluded:

> "*A criminal conviction and sentence of imprisonment* extinguish an individual's right to freedom from confinement for the term of his sentence, but they *do not authorize the State* to classify him as mentally ill and *to subject him to involuntary psychiatric treatment without affording him additional due process protections.*"

*Id.* at 493–94, 100 S.Ct. at 1263–64 (emphasis added).[6] The required due process protections included notice to the prisoner of the proposed action, a hearing, and an independent decision maker. Recognizing that a medical question was involved, the Court nevertheless said:

> "The medical nature of the inquiry, however, does not justify dispensing with due process requirements. It is precisely '[t]he subtleties and nuances of psychiatric diagnoses' that justify the requirement of adversary hearings."

*Id.* at 495, 100 S.Ct. at 1264 (quoting *Addington v. Texas*, 441 U.S. 418, 430, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979)).

■ Bee also contends that this case raises First Amendment concerns, and we agree. The First Amendment protects the

---

6. In *Vitek*, the Court was faced with the added factor of stigmatization of the prisoner by his transfer to a mental health hospital. Nonetheless, given the potential of antipsychotic drugs for causing severe mental and physical effects, including possible irreversible damage, we do not view this distinction as significant to our analysis. The potential loss of liberty in this case appears at least as great as the potential for stigma in *Vitek*.

communication of ideas, which itself implies protection of the capacity to produce ideas. *See Rogers v. Okin,* 478 F.Supp. 1342, 1366–67 (D.Mass.1979), *aff'd in part and rev'd in part, Rogers v. Okin,* 634 F.2d 650 (1st Cir.1980), *vacated and remanded on other grounds sub nom. Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982). Antipsychotic drugs have the capacity to severely and even permanently affect an individual's ability to think and communicate. *See, e.g., Davis,* 506 F.Supp. at 927–29.

> "In a society whose 'whole constitutional heritage rebels at the thought of giving government the power to control men's minds,' the governing institutions, and especially the courts, must not only reject direct attempts to exercise forbidden domination over mental processes; they must strictly examine as well oblique intrusions likely to produce, or designed to produce, the same result."

L. Tribe, American Constitutional Law § 15–5, at 899 (1978) (quoting *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969)). *See also id.* § 15–8.

■ Given the undisputed nature of antipsychotic drugs, we hold that a pretrial detainee retains a liberty interest derived from the Constitution in avoiding unwanted medication with such drugs. That does not end our analysis, however, for the protected interest is not absolute. *See Romeo,* 457 U.S. at 319–320, 102 S.Ct. at 2460–61. It must be balanced against competing state interests to determine whether it is outweighed by " 'the demands of an organized society.' " *Id.* at 320, 102 S.Ct. at 2461 (quoting *Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)).

### B. Competing State Interests

■ Pretrial detainees do "not possess the full range of freedoms of an unincarcerated individual." *Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1877; *accord Block v. Rutherford,* —— U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). The Court acknowledged in *Wolfish* that pretrial detainees retain certain constitutional rights but held that " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " 441 U.S. at 545–46, 99 S.Ct. at 1877 (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)). "[E]ven when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* 441 U.S. at 547, 99 S.Ct. at 1878. Moreover, prison administrators must be accorded

> "wide-ranging deference in the adoption and execution of [prison] policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.... '[I]n the absence of substantial evidence in the record to indicate that the officials have *exaggerated their response* to these considerations, courts should ordinarily defer to their expert judgment in such matters.' "

*Id.* at 547–48, 99 S.Ct. at 1878 (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)) (citation omitted) (emphasis added).

Defendants assert three state concerns which they claim outweigh any liberty interest Bee may have in freedom from unwanted antipsychotic drugs: (1) the right and duty of the jail to treat a mentally ill detainee; (2) the jail's interest in maintaining the detainee in a competent condition to stand trial; and (3) the jail's duty to maintain security and to prevent a violent and dangerous mentally ill prisoner from injuring himself and others. Each of these asserted interests must be judged in light of above-quoted admonitions in *Wolfish.* The trial judge granted summary judgment for defendants without weighing Bee's constitutionally protected interest against the reasons offered by the state for forcibly injecting him with antipsychotic drugs.

Moreover, the record establishes contested issues of fact material to this balancing process. We therefore must remand this case for the trial court's further consideration under the guidelines outlined below.

■ The first interest asserted is not a legitimate state concern in this case. True, the jail is under a constitutional duty to treat the medical needs of pretrial detainees, *Jones v. Diamond*, 636 F.2d 1364, 1378 (5th Cir.1981), and such treatment includes mental as well as physical disorders, *cf. Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir.1977). The premise underlying this duty is that the state may not deliberately fail to provide necessary medical treatment *when it is desired by the detainee.* Medical treatment is designed to ensure that the conditions of pretrial detention do not amount to the imposition of punishment. *Wolfish*, 441 U.S. at 535, 99 S.Ct. at 1871. This constitutional requirement cannot be turned on its head to mean that if a competent individual chooses not to undertake the risks or pains of a potentially dangerous treatment, the jail may force him to accept it. Absent legitimate government objectives such as those discussed below, we believe that involuntary medication may itself amount to unconstitutional punishment.

■ Second, the jail contends that it was entitled to inject Bee forcibly with thorazine in order to keep him competent for trial. As we noted initially, however, the state court found after a hearing "that Daniel H. Bee is not mentally ill and *is competent* to stand trial." Rec., vol. I, at 132 (emphasis added). Given this determination, the state's asserted interest in keeping Bee competent to stand trial is not implicated in this case; therefore it cannot serve to override Bee's interest in avoiding forcible medication with antipsychotic drugs.

■ Moreover, although the state undoubtedly has an interest in bringing to trial those accused of a crime, we question whether this interest could ever be deemed sufficiently compelling to outweigh a criminal defendant's interest in not being forcibly medicated with antipsychotic drugs. With their potentially dangerous side effects, such drugs may not be administered lightly. Generally speaking, a decision to administer antipsychotics should be based on the legitimate treatment needs of the individual, in accordance with accepted medical practice. A state interest unrelated to the well being of the individual or those around him simply has no relevance to such a determination. The needs of the individual, not the requirements of the prosecutor, must be paramount where the use of antipsychotic drugs is concerned.

Indeed, Utah has recognized the right of a mentally ill person not to be subjected to involuntary mental treatment absent a hearing at which the court finds inter alia that "[t]he patient lacks the ability to engage in a rational decision-making process regarding the acceptance of mental treatment as demonstrated by evidence of inability to weigh the possible costs and benefits of treatment." Utah Code Ann. § 64–7–36(10)(c) (Supp.1983). The statute's requirement that the individual must be found incompetent to consent to treatment has been interpreted to mean that he must be found incompetent to consent to proposed medication. *See A.E. v. Mitchell*, 724 F.2d 864, 867–68 (10th Cir.1983). No such determination has been made with regard to Bee.

■ The third interest asserted by defendants is the jail's duty to protect the jail staff and others from a violent detainee. Admittedly, this is a serious concern. *See Block v. Rutherford*, —— U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). Bee does not dispute that forcible medication with antipsychotic drugs may be required in an emergency. Absent an emergency, however, we do not believe forcible medication with antipsychotic drugs is "reasonably related," *Wolfish*, 441 U.S. at 539, 99 S.Ct. at 1874, to the concededly legitimate goals of jail safety and security.

■ Determining that an emergency exists sufficient to warrant involuntary medication with this type of drug requires

a professional judgment-call that includes a balancing of the jail's concerns for the safety of its occupants against a detainee's interest in freedom from unwanted antipsychotics. Any decision to administer antipsychotic drugs forcibly must be the product of professional judgment by appropriate medical authorities, applying accepted medical standards. *Cf. Youngberg v. Romeo*, 457 U.S. 307, 321–23, 102 S.Ct. 2452, 2461–62, 73 L.Ed.2d 28 (1983); *Rennie v. Klein*, 720 F.2d 266, 269 (3rd Cir.1983). It requires an evaluation in each case of all the relevant circumstances, including the nature and gravity of the safety threat, the characteristics of the individual involved, and the likely effects of particular drugs.

The availability of alternative, less restrictive courses of action should also be considered. In view of the severe effects of antipsychotic drugs, forcible medication cannot be viewed as a reasonable response to a safety or security threat if there exist "less drastic means for achieving the same basic purpose." *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); *see also Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 185, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). Our constitutional jurisprudence long has held that where a state interest conflicts with fundamental personal liberties, the means by which that interest is promoted must be carefully selected so as to result in the minimum possible infringement of protected rights. *See, e.g., Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510

(1965) (governmental purpose "may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms") (quoting *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 307, 84 S.Ct. 1302, 1313, 12 L.Ed.2d 325 (1964)); *Shelton*, 364 U.S. at 488, 81 S.Ct. at 252 (governmental purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved"). Thus, less restrictive alternatives, such as segregation or the use of less controversial drugs like tranquilizers or sedatives, should be ruled out before resorting to antipsychotic drugs.[7]

▆▆▆▆ In granting summary judgment for defendants in this case, the district court did not determine whether an emergency existed. Summary judgment may be granted only where there is no doubt from the evidence, with all inferences drawn in favor of the nonmoving party, that no genuine issue of material fact remains for trial and that the moving party is entitled to judgment as a matter of law. *See, e.g., Houghton v. Foremost Financial Services Corp.*, 724 F.2d 112, 114 (10th Cir.1983); *Cayce v. Carter Oil Co.*, 618 F.2d 669, 672–73 (10th Cir.1980); *Madison v. Deseret Livestock Co.*, 574 F.2d 1027, 1036 (10th Cir.1978). Whether an emergency actually existed in this case is a disputed fact issue that precludes the grant of summary judgment. *See supra* note 1. In the event an emergency did exist, there is also a material issue of fact as to whether forcible medi-

---

7. We recognize that the Supreme Court has declined to apply a "less intrusive means" analysis to a decision regarding treatment of an involuntarily committed mental patient. *See Romeo*, 457 U.S. at 322–24, 102 S.Ct. at 2462–63. *Romeo* is distinguishable both because it involved temporary physical restraints rather than mental restraints with potentially long term effects, *see Rennie v. Klein*, 720 F.2d 266, 274–77 (3d Cir. 1983) (Weis, J., concurring), and because Romeo had been certified as severely retarded and unable to care for himself, *see Romeo*, 457 U.S. at 309–10, 102 S.Ct. at 2454–55. In this case, the question is whether an emergency exists sufficient to justify the state injecting a pretrial detainee, who has not been declared mentally incompetent under appropriate state procedures,

with a potentially dangerous drug. Under these circumstances, we believe the state is required to consider less restrictive alternatives. *Cf. Wolfish*, 441 U.S. at 574, 99 S.Ct. at 1892 (Marshall, J., dissenting) ("There is no basis for relaxing this [less restrictive alternatives] requirement when the rights of presumptively innocent detainees are implicated."). Indeed, the jail regulations of the detention center in this case specifically suggest segregation as the appropriate measure when mentally ill patients "upset or provoke" other inmates. *See* Jail Reg. 4/04–04.04(1), rec., vol. I, at 153. The jail regulations also contemplate that commitment "shall be considered for inmates with moderate to severe mental problems." *See id.* .04(2)(a), rec., vol. I, at 153.

cation for an *indefinite period* was an "exaggerated response" in this case. *See Wolfish,* 441 U.S. at 548, 99 S.Ct. at 1878.

The summary judgment in favor of defendants is reversed and the case is remanded for further consideration in light of this opinion.[8]

---

8. Certain of the defendants argue that they should be dismissed from the lawsuit because it has not been shown that they participated in the alleged constitutional violations. The trial court did not address these arguments and we think that court is the more appropriate forum to do so in the first instance.