William Scott **MORRIS** and Charlene A. **Morris,** his wife, Plaintiffs,

v.

The **LOMAS AND NETTLETON COMPANY,** Defendant.

No. 87–4086–R.

United States District Court, D. Kansas.

Feb. 27, 1989.

William Scott Morris, Topeka, Kan., for plaintiffs.

Charles R. Hay, Goodell, Stratton, Edmonds & Palmer, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action brought by the plaintiffs, husband and wife, against the defendant, Lomas & Nettleton Company, seeking declaratory and injunctive relief and damages for defendant's alleged violations of the Truth–in–Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*, and the Kansas Consumer Protection Act, K.S.A. 50–623 *et seq.* This matter is presently before the court upon defendant's motion for summary judgment.

This action was filed by the plaintiffs on March 20, 1987. In their complaint, plaintiffs seek rescission of a mortgage entered into with the defendant based on violations of the TILA. Plaintiffs assert that they can now rescind the mortgage because the defendant failed to provide them with copies of the notice of the right to rescind and failed to provide them the requisite period of time following the completion of the transaction in which to ask for rescission. Plaintiffs also allege that a right of rescission still exists because the defendant has failed to make the following material disclosures concerning the mortgage: (1) amount financed; (2) itemization of amount financed; (3) annual percentage rate; (4) variable rate; (5) demand feature; (6) late payment; (7) security interest; (8) insurance; and (9) required deposit. Plaintiffs also complain of the defendant's failure to disclose the negative amortization aspect of the mortgage. Finally, they assert that the actions of the defendant constitute violations of the Kansas Consumer Protection Act. Plaintiffs ask for rescission of the mortgage, return of all monies paid by them, actual damages, civil penalties, interest, costs and attorney's fees.

The instant motion for summary judgment is a comprehensive one. The motion is directed at all of the claims raised by the plaintiffs in their complaint. Plaintiffs have failed to respond to many of the arguments made by the defendant. We must assume that plaintiffs have abandoned the majority of their claims based on their response. The only arguments raised by the plaintiffs concerning the Truth–in–Lending Act involve a discussion of whether they have a right to rescind the transaction and whether the defendant's failure to disclose negative amortization constituted a material disclosure under the Truth–in–Lending provisions. Accordingly, the court shall focus upon the claims argued by the plaintiffs. However, we shall briefly note the other matters during the course of this opinion.

■ A moving party is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). An issue of fact is "material" only when the dispute is over facts that might affect the outcome of the suit

under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*, at 247–48, 106 S.Ct. at 2509–10. The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues. *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986). The court must also consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). The language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The facts relevant to this case are generally uncontroverted. To the extent that some facts remain in dispute, they shall be considered by the court in the light most favorable to the plaintiffs. The facts are somewhat complicated, so we shall set them forth in some detail.

The defendant is a mortgage investment firm. The plaintiffs are married. Plaintiff Scott Morris is an attorney in private practice in Topeka, Kansas. He was sworn into the bar in September, 1984. Prior to that time, Scott, who had a real estate license, had been associated with a Topeka real estate agency. He had also been employed as a law clerk for a Topeka attorney. Plaintiff Charlene Morris presently is office manager at Laird Noller Ford and has worked in office management for various firms over the past ten years. In 1984, she was office manager for a firm of certified public accountants where her duties involved preparation of payroll information and monthly financial statements for the firm.

In April 1981, Charlene Morris was divorced from her previous husband by a decree entered in the District Court of Shawnee County, Kansas. The decree incorporated a separation and property settlement agreement entered the same date. That agreement awarded the home of the parties at 1317 Campbell in Topeka, Kansas to Charlene Morris. However, the decree granted an interest in the property to her ex-husband, as follows:

Wife is awarded the property located at 1317 Campbell Street, Topeka, Shawnee County, Kansas, subject, however, to a judicial or secondary lien on said property in an amount equal to one-half of the equity of the parties in the property over and above the present mortgage balance on said property of approximately Twenty Thousand Dollars ($20,000.00). Said judicial lien, or secondary lien, on said property is to be in the amount of Thirty Thousand Dollars ($30,000.00) in favor of Husband. The property is legally described as follows:

The North ⅔ of Lot 130, less the West 12 feet thereof AND Lot 131 on Campbell Boulevard in Holland–Washburn Place Addition to the City of Topeka, Shawnee County, Kansas.

This obligation shall bear no interest. The obligation shall be payable to Husband by Wife or her representative (in the event of her death), upon death, or remarriage of Wife, the Wife moving from said property and thus changing her primary residence, upon the sale of such property or upon the youngest surviving child of the parties reaching the age of majority, whichever shall first occur.

In 1983, Charlene and Scott decided to get married. Both recognized that they had to pay off Charlene's ex-husband to be able to marry. Her ex-husband refused to accept less than $30,000 and insisted upon full payment. Charlene contacted several financial institutions about the possibility of a loan, but she was unsuccessful.

In January 1984, Charlene contacted the defendant to find out whether it would consider the loan. Charlene explained over the telephone that she wanted to refinance her home and needed $30,000 to $40,000 over her current mortgage on the home. She advised the woman listening that she needed to keep the payment down within a certain range and asked if the defendant had any loan plan that would meet those requirements. Charlene was told about a loan plan in which a lower payment was made during the initial years of the loan, and the amount of the payment increased thereafter. Charlene believed that $650.00 per month was the maximum payment she and Scott could make.

On February 1, 1984, plaintiffs met with Steve Aulgur, a loan officer with the defendant. Plaintiffs explained the reason for the loan, including the need to pay $30,000 to Charlene's ex-husband. Plaintiffs were informed that they would probably not qualify for the loan if Scott retained his obligation to make $300 per month payments against his personal loans. Plaintiffs then decided to include these loans in an amount to be financed and paid from the loan proceeds. Aulgur explained the loan plan to the plaintiffs, stating that the value of the home would indicate that they could receive up to $70,000 in loan proceeds. Aulgur also gave an approximate range of the mortgage payment and indicated that it was set up on an 8.5% rate for the first three years. Aulgur also indicated that payments would increase by 10% in each of the fourth and fifth years. Plaintiffs then submitted a residential loan application to defendant. It was signed by Charlene as the principal borrower with Scott as the co-borrower. Plaintiffs also signed an application for conventional mortgage. This form stated that the plaintiffs would pay all costs of the loan at closing, including fees for an appraisal, credit reports, closing costs, prepaid interest, an escrow deposit and three points. Section 2.01 of the application form also stated the following:

> The Index used to establish the interest rate is the monthly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the U.S. Federal Reserve Board. The accrual rate on loans secured by owner-occupied properties is the Index rounded up to the nearest ⅛ of one percent plus 2% points. Index adjustments every 12 months to term.... The initial payment rate is the accrual rate established at loan closing less 4% points. In no event, however, shall the initial payment rate of a loan under this commitment be less than 10.875% or the Index established at loan closing, whichever is the lesser numerical value. The initial Payment Amount (Principal and interest based upon the initial Payment Rate) will remain constant for payments 1 through 36. Payments 37 through 48 for Principal and Interest will be 10 percent higher than the P & I payment required during the preceding thirty-six month period. Payments 49 through 60 for Principal and Interest will be 10 percent higher than the P & I payment required during the preceding twelve month period. At the end of the initial Payment Period, i.e., the first five (5) years of the loan term, the Payment Rate will be reset to the Accrual Rate and the Payment Rate shall remain constant for twelve month adjustment periods to term, with loan reamortization to occur every twelve months to term.

> . . . . .

> Notwithstanding any limits that may be imposed on payment rate or total payment amount increases during the loan term, negative amortization will not be permitted to result in an outstanding principal balance in excess of 125% of the original principal balance of the loan. Accordingly, on each change date, the amount of negative amortization that will occur during the following period if the borrower elects to limit the payment increase will be determined by Lender. If the unpaid principal balance of the loan on the change date plus the amount of negative amortization that will occur during the subsequent interest period exceeds 125% of the original loan balance, the borrower will be permitted to limit the payment only to the extent that it

does not result in increasing the principal balance to more than 125% of the original principal loan balance.

On February 3, 1984, an initial Truth–in–Lending statement was mailed by the defendant to plaintiffs. This statement indicated that the annual percentage rate was 13.125% on an amount financed of $68,531.68. It also stated that the amount of each of the first 36 payments would be $534.60, that the amount would increase to $588.06 for payments 37 through 48, and that the amount would then increase to $646.86 for payments 49 through 60. As to payments 61 through 360, it stated the following:

The monthly payment commencing on the 61st payment will be sufficient to fully amortize the unpaid principal balance of the loan plus current interest for the remaining term of the loan. Payments may increase or decrease each year depending on current interest rates.

If the monthly payments are not sufficient to pay the current interest due, the balance of the interest will be added to the unpaid principal balance of the loan up to 125% of the original principal of the loan. Monthly payments will then be adjusted upward.

Thereafter, a good faith estimate of closing costs was provided to the plaintiffs. The estimate reflected the costs anticipated to be charged for various fees in connection with concluding the transaction. The costs were fully detailed by category. By letter dated March 13, 1984, the application was approved by the defendant.

On March 21, 1984, a Wednesday, the parties met to sign various documents. Aulgur represented the defendant at the meeting. Plaintiffs signed a mortgage and an attached document entitled "Adjustable Rate Rider," which contained the following provisions:

2. INTEREST

Interest will be charged on that part of principal which has not been paid. Interest will be charged beginning on the date of this Note and continuing until the full amount of principal has been paid.

Beginning on the date of this Note, I will pay interest at a yearly rate of 12.125%. This rate is called the "Initial Rate of Interest." The rate of interest I will pay will change in accordance with Section 4 of this Note.

3. PAYMENTS.

(B) Interest Payments.

My monthly payments will be applied first to interest due and then to principal. Any part of interest due that is greater than the current amount of my monthly payment will be capitalized. "Capitalized" means that part of the interest due which is greater than my monthly payment will be advanced by Note Holder on my account and added to the outstanding principal balance under this Note.

If I do not want interest to be capitalized, I may remit the full amount of interest, which is due and payable each month. The Note Holder will tell me the full amount of interest I owe each month if I ask the Note Holder to do so 30 days before the date payment is due.

The "Adjustable Rate Rider" also stated in large boldface capital letters the following: "MAXIMUM MORTGAGE AMOUNT NOT TO EXCEED $88,875.00."

Plaintiffs received a real estate settlement statement on a form promulgated by the United States Department of Housing and Urban Development. The form contained an itemization of settlement charges.

Plaintiffs also received a Truth–in–Lending disclosure statement. The disclosure reflected a total of payments to be made over the 30–year life of the loan at $274,824.36, as had the initial disclosure statement. The statement noted the increasing amount of annual payments and contained disclosures as to the variable rate feature of the loan.

The last document that was signed was a rescission notice for the purpose of Truth–in–Lending requirements. The rescission notice specifically stated that the plaintiffs had entered into a transaction on March 21, 1984 and had three business days from that date to cancel. It stated that the plaintiffs, should they elect to cancel, could do so by

mail or telegram sent not later than midnight of March 24, 1984, a Saturday. By signature in a box in the lower third of the document, each plaintiff acknowledged receipt of two copies of the notice, as well as one copy of other Truth–in–Lending disclosures, on March 21, 1984.

Plaintiffs then signed at the bottom of the rescission notice underneath the following paragraph:

> The undersigned being first duly sworn according to law upon oath state: that I/We have had two copies each of this Rescission Notice more than three full business days, that I/We have been requested to carefully read all of the above, that I/WE HAVE CAREFULLY READ SAME AND UNDERSTAND SAME, and that I/We have not exercised, and do not exercise, the right to rescind the credit transaction to which this Rescission Notice applies.

Plaintiffs signed this portion of the form after Aulgur told them that the transaction would be completed sooner if they signed. Aulgur advised them that they could take the rescission notice home or they could sign it now. He told the plaintiffs that signing now was the "easy way to take care of it." He indicated to them that he could take the form with him and this would allow the loan proceeds to be disbursed quickly. Plaintiffs agreed and utilized Edward W. Brogan, Scott's associate in the real estate business, to act as notary public for their signatures.

On March 26, 1984, the funds were disbursed to conclude the transaction. Thereafter, on April 3, 1986, plaintiffs filed a formal notice of rescission. Plaintiffs subsequently filed suit in state court seeking rescission. That case was later dismissed and this action was filed on March 20, 1987.

As noted previously in this Memorandum and Order, plaintiffs' complaint contains a laundry list of alleged violations of the Truth–in–Lending Act. However, in their response to the defendant's motion for summary judgment, plaintiffs discuss only two alleged violations: (1) the failure of the defendant to disclose the negative amortization aspect of their loan; and (2) defendant's circumvention of the rescission period by having them certify that they did not wish to exercise their right to rescission prior to the conclusion of the three-day waiting period. Plaintiffs contend that these violations now permit rescission of the transaction. Again, the focus of this Memorandum and Order shall be upon the issues now argued by the plaintiffs.

Congress enacted the TILA to ensure meaningful disclosures in consumer credit transactions. 15 U.S.C. § 1601(a). Congress intended the TILA to aid unsophisticated consumers and to prevent creditors from misleading consumers as to the actual cost of financing. *See Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 363–69, 93 S.Ct. 1652, 1657–60, 36 L.Ed.2d 318 (1973). The TILA achieves its remedial goals by a system of strict liability in favor of consumers when the mandated disclosures have not been made. 15 U.S.C. § 1640(a).

The Federal Reserve Board promulgated Regulation Z to execute the purposes of TILA. Absent some obvious repugnance to the statute, the Board's regulations implementing the TILA should be accepted by the courts, as should the Board's interpretation of its own regulations. *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 2274, 68 L.Ed.2d 783 (1981).

## CIVIL PENALTY

■ The court shall begin with a discussion of plaintiffs' request for civil penalties based on the defendant's alleged violations of the TILA. Such a claim is subject to a one-year statute of limitations. 15 U.S.C. § 1640(e). The limitations period starts to run "from the date of the occurrence of the violation." *Id.* Here, the limitations period began to run on March 21, 1984, the date of the closing. *See Stevens v. Rock Springs National Bank*, 497 F.2d 307 (10th Cir.1974). Thus, plaintiffs' claim for civil penalties is untimely since this action was not filed until March 20, 1987.

## RESCISSION

■ The TILA provides that when a creditor takes a security interest in proper-

ty which is used as the principal residence of the consumer, the consumer has the right to rescind the transaction the later of: (1) the end of the third business day following the transaction; or (2) the date on which the creditor delivers to the consumer notice of the right of rescission and the material disclosures required by the TILA. 15 U.S.C. § 1635(a). In other words, if the disclosure statement fails to comply with the TILA's material disclosure requirements, the consumer has a continuous right to rescind for as long as the creditor fails to comply, up to a maximum of three years. 15 U.S.C. § 1635(f).

For the purposes of this opinion, the court shall assume that the right of rescission under the TILA is applicable to the instant transaction. The defendant has argued that the TILA is not applicable here because this transaction was a "residential mortgage transaction," which is exempt from the TILA pursuant to 15 U.S.C. § 1635(e)(1)(A). Given the court's ultimate resolution of this case, we find it unnecessary to reach this issue.

The court shall first consider whether the defendant failed to make material disclosures concerning the transaction with the plaintiffs. A "material disclosure" is the "disclosure ... of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, and the due date or periods of payments scheduled to repay the indebtedness." 15 U.S.C. § 1602(u). Regulation Z defines "material disclosures" as "the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total of payments, and the payment schedule." 12 C.F.R. § 226.23 n. 48.

■ The aforementioned discussion of the definition of "material disclosure" immediately requires the rejection of many of the claims made by plaintiffs in their complaint. Plaintiffs' allegations concerning the defendant's failure to properly disclose a demand feature, later payment fees, lien against the property, insurance and required deposits, do not refer to material disclosures. Accordingly, the failure to make these disclosures does not provide an extension of the rescission period.

The court further finds that the uncontroverted facts before the court require that summary judgment be entered against the plaintiffs on some of their other claims of defendant's failure to make material disclosures. The record discloses that the defendant fully complied with the TILA in disclosing: (1) the amount financed; (2) the itemization of the amount financed; and (3) the annual percentage rate.

■ The only issue left for consideration is whether defendant failed to properly disclose the finance charge because of their disclosure concerning the potential amount of negative amortization. The simple response to the plaintiffs' argument is that the TILA and its accompanying regulations do not require the type of disclosure suggested by the plaintiffs. The question before the court is not whether such a disclosure should be made or whether such a disclosure would be beneficial to the debtor. The only issue faced by the court is whether the defendant failed to make a material disclosure as required by the TILA. We fail to find that the defendant's disclosures concerning negative amortization violated the TILA. The Official Staff Interpretations to Regulation Z state that "at the creditor's option" the segregated Truth–in–Lending disclosures may include various items of information including a "brief reference to negative amortization in variable rate transactions." 12 C.F.R. § 226, Supp. I, § 226.17(a) ¶ 5. Thus, under the explicit language of the Interpretations, any reference to negative amortization is not required. In addition, the Interpretations contain explicit instructions as to the required disclosures when negative amortization exists. The Interpretations state as follows:

*Graduated payment adjustable rate mortgages.* These mortgages involve both a variable interest rate and scheduled variations in payment amounts during the loan term. For example, under

these plans, a series of graduated payments may be scheduled before rate adjustments affect payment amounts, or the initial scheduled payment may remain constant for a set period before rate adjustments affect the payment amount. In any case, the initial payment amount may be insufficient to cover the scheduled interest, causing negative amortization from the outset of the transaction. In these transactions, the disclosures should treat these features as follows:

The finance charge includes the amount of negative amortization based on the assumption that the rate in effect at consummation remains unchanged.

The amount financed does not include the amount of negative amortization.

As in any variable-rate transaction, the annual percentage rate is based on the terms in effect at consummation.

The schedule of payments discloses the amount of any scheduled initial payments followed by an adjusted level of payments based on the initial interest rate. Since some mortgage plans contain limits on the amount of the payment adjustment, the payment schedule may require several different levels of payments, even with the assumption that the original interest rate does not increase.

*Id.*, at § 226.17(c) ¶ 8.

The aforementioned requirements were met by the defendant in this case. The disclosures made to the plaintiffs reflected the foregoing matters concerning negative amortization. Accordingly, plaintiffs' arguments concerning the defendant's failure to disclose the negative amortization aspect of this loan are without merit. Thus, plaintiffs cannot be afforded an extension of their right of rescission based on this argument.

Finally, we shall consider the plaintiffs' argument that their right to rescission remains alive because they were induced to waive their rescission rights without declaring a bona fide emergency. This argument arises from the fact that the plaintiffs indicated on the date of the closing of their loan that they, having had the notice of right of rescission form for three days, had decided not to elect to rescind the transaction. Plaintiffs suggest that this violation of the TILA allows rescission of the transaction at this time.

This contention requires a close examination of the three-day waiting period provided by the TILA. Among the disclosures required of creditors is the notification to the consumer of the consumer's unequivocal right to rescind the transaction within three business days of its consummation. 15 U.S.C. § 1635(a). During this three-day period, the creditor may not disburse funds, deliver materials, or perform any services connected with the credit agreement. 12 C.F.R. § 226.23(c). The creditor must be "reasonably satisfied" that the consumer has not elected to rescind the transaction following the expiration of the three-day period. Official Staff Interpretations, 12 C.F.R. § 226, Supp. I, § 226.23(c) ¶ 4. The creditor may satisfy itself by (1) waiting a reasonable time after expiration of the rescission period to allow for delivery of a mailed notice; or (2) obtaining a written statement from the consumer that the right has not been exercised. *Id.* The consumer may also agree to waive the right of rescission under certain limited circumstances. Waiver of the right of rescission is only allowed if the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency. 12 C.F.R. § 226.23(e). In order to waive the right, the consumer must give the creditor a dated written statement that describes the emergency, specifically modifies or waives the right to rescind, and bears the signature of all of the consumers entitled to rescind. *Id.* A creditor may not use a printed form for this purpose. *Id.*

An examination of the facts, viewed in the light most favorable to the plaintiffs, reveals the error of plaintiffs' argument. The facts do not support the plaintiffs' contention that the defendant improperly induced them to waive their right of rescission. The facts clearly indicate that the plaintiffs never waived or agreed to waive their right of rescission. The plaintiffs

never sought such a waiver and the defendant never agreed to such a waiver. The defendant, through its agent Steve Aulgur, only asked plaintiffs if they wished to sign the portion of the right of rescission form indicating that they did not wish to exercise their right of rescission following the expiration of the three-day period. The purpose of a waiver would be to allow the creditor to disburse the loan proceeds prior to the expiration of the three-day period. Here, the loan proceeds were disbursed after the expiration of the three-day period. The purpose of signing the election not to rescind portion of the form prior to the expiration of the three days was to allow the defendant to disburse the funds quickly after the expiration of the three-day period. Plaintiffs still retained their right to rescind during the three-day period and could have exercised it. Plaintiffs chose not to, and the defendant was thereafter allowed to disburse the loan proceeds immediately after the conclusion of the three-day period because the defendant was "reasonably satisfied" that the plaintiffs did not wish to rescind the transaction since the defendant had the signed statement that the plaintiffs had not exercised their right of rescission. All parties fully understood the nature of this transaction. This is fully evidenced by the fact that the parties clearly noted on the rescission notice that the plaintiffs' signatures were notarized on March 21, 1984.

The court finds that no violation of the TILA occurred in the plaintiffs' signing of the rescission notice. Plaintiffs did not waive their right of rescission but simply pre-dated their statement indicating an election not to rescind the transaction. We do not find that this violates either the letter or the spirit of the TILA. Plaintiffs retained their right to rescind during the three-day period and then failed to exercise it. Plaintiffs have not pointed to any particular provision of the TILA or its accompanying regulations suggesting that what occurred here is a violation. There is no indication that the defendant performed any prohibited act during the three-day waiting period. Accordingly, we do not find that the defendant's action on March

21, 1984 served to extend the plaintiffs' right of rescission.

In sum, plaintiffs' arguments lack merit and the plaintiffs are now barred from rescinding the transaction that they entered into with the defendant on March 21, 1984. The defendant's motion for summary judgment concerning plaintiffs' TILA claims must be granted.

Since the court has granted summary judgment against the plaintiffs on all of their federal claims, the court shall dismiss the remaining pendent state claims. *United ed Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Jones v. Intermountain Power Project*, 794 F.2d 546, 549 (10th Cir.1986).

IT IS THEREFORE ORDERED that defendant's motion for summary judgment be hereby granted. Judgment shall be entered for the defendant and against the plaintiffs.

IT IS SO ORDERED.