Michael HOGAN, Plaintiff–Appellee,

v.

James CARTER, Defendant–Appellant.

No. 94–7037.

United States Court of Appeals,
Fourth Circuit.

Argued April 2, 1996.

Decided June 4, 1996.

**ARGUED:** Jacob Leonard Safron, Special
Deputy Attorney General, Office of the At-

torney General, Raleigh, North Carolina, for Appellant.

James Phillip Griffin, Jr., North Carolina Prisoner Legal Services, Inc., Raleigh, North Carolina, for Appellee.

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge LUTTIG wrote the majority opinion, in which Chief Judge WILKINSON and Judges RUSSELL, WIDENER, WILKINS, NIEMEYER, HAMILTON, and WILLIAMS joined. Judge MOTZ wrote an opinion concurring in the judgment, in which Judges HALL, MURNAGHAN, ERVIN, and MICHAEL joined.

## OPINION

LUTTIG, Circuit Judge:

Appellant Dr. James Carter, a Board Certified Psychiatrist and tenured Professor of Psychiatry at Duke University, was the physician-on-call responsible for emergencies at the Mental Health Facility of the North Carolina Central Prison during the late night and early morning hours of September 20–21, 1992. While at home some 35 miles from the prison that night, Dr. Carter received a telephone call from the staff at the Mental Health Facility informing him that appellee, Michael Hogan, an inmate at the prison's Mental Health Facility, had been in the throes of an uncontrollable seizure for some three hours and was at risk of seriously injuring himself. Aware of Hogan's self-mutilative tendencies and familiar with Hogan's prior successful treatment with the antipsychotic drug Thorazine, Dr. Carter authorized the administration to Hogan of a single, low, emergency dose of the drug in order to calm Hogan's rage. The Thorazine was administered, and Hogan was calmed without suffering any injury.

Hogan subsequently filed the instant action against Dr. Carter under 42 U.S.C. § 1983, alleging that Dr. Carter's authorization of the single emergency dose of Thorazine against his will, and without a prior hearing, violated his rights under the Due Process Clause of the Fourteenth Amendment. Dr. Carter's motion for summary judgment on grounds of qualified immunity was denied by the district court, a panel of this court affirmed, and we thereafter *sua sponte* granted rehearing *en banc*. Because Dr. Carter was unquestionably entitled to qualified immunity, we now reverse the judgment of the district court and remand with instructions to enter judgment for Dr. Carter.

## I.

Hogan was admitted to the Mental Health Facility of North Carolina's Central Prison on August 31, 1991, following an attempted suicide in which he swallowed razor blades and unknown pills. Dr. Carter first encountered Hogan two months later, when he admitted Hogan to the facility's Acute Hospital after Hogan attempted to assault a physician. While a patient in the Acute Hospital, Hogan was diagnosed by Dr. James Smith, a Board Certified Psychiatrist and Clinical Director of Mental Health at Central Prison, as having a severe Borderline Personality Disorder with antisocial features and by Dr. Carter as having a bipolar disorder. J.A. at 54. Until the incident that gave rise to this lawsuit occurred, Hogan was primarily treated by Dr. Smith. Dr. Carter, however, was kept apprised by Dr. Smith concerning the course and results of Hogan's treatment.

At approximately 1:45 in the morning on September 21, 1992, John Butler, R.N., the Nursing Supervisor on duty at the facility, contacted Dr. Carter at home by telephone and advised Dr. Carter that for the previous three hours Hogan had been "talking loudly and beating on his cell door" in such a way that "it was apparent that [he] could injure [himself] as a result of kicking and banging on [his] door[ ] with [his] fists." *Id.* at 49; *see also id.* at 55 (Dr. Carter's affidavit) ("I was notified that inmate Hogan had resumed his aggressive, disruptive, uncontrollable behavior.... At 1:00 a.m., it was recorded that inmate Hogan continued to beat and bang on the cell, kicking and cursing staff and others."). After discussing Hogan's be-

havior with Butler, Dr. Carter ordered that Hogan be placed in restraints and given, intramuscular, a single 50 mg. dose of Thorazine. Dr. Carter knew at the time that Hogan himself had requested Thorazine on prior occasions and that the drug had been administered to Hogan without side effect.[1]

Hogan was thereafter placed in restraints and administered the single small dose of Thorazine, as ordered by Dr. Carter. After allowing time for the medication to take effect, a nurse conducted a medical screening of Hogan, determining that he had suffered no injuries and noting that he complained of no injuries. *Id.* at 45–46, 47, 49. When Hogan was calm, the restraints were removed. *Id.* at 76.

Following this incident, Hogan filed this action under Title 42, section 1983, alleging that administration of the single emergency dose of Thorazine, without first conducting a full evidentiary hearing, violated his liberty interest in not being injected with antipsychotic drugs without due process of law. Dr. Carter moved for summary judgment on the ground that he was qualifiedly immune from liability because he had not violated clearly established law in ordering administration of the Thorazine. The district court denied Dr. Carter's motion, holding, on the basis of the Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), and several unpublished opinions from our circuit, that Hogan "had a clearly established constitutional right to a hearing, notice of the hearing, the right to present and cross-examine witnesses, and judicial review of the decision to medicate," J.A. at 139, prior to administration of the

single, emergency dose of Thorazine. On interlocutory appeal from the district court's denial of Dr. Carter's motion, a panel of this court affirmed in an unpublished *per curiam* opinion. *Hogan v. Carter*, No. 94–7037, 1995 WL 674574 (4th Cir. Nov. 14, 1995).

## II.

■ The sole question before us, as it was before the district court and panel, is whether Dr. Carter violated clearly established law when, in response to the nurse's call during the early morning hours of September 21 informing him that Hogan was in jeopardy of injuring himself, he ordered that Hogan be administered the single emergency dose of Thorazine. It is well established that government officials are protected by the doctrine of qualified immunity not only from damage liability but from suit, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ Hogan candidly conceded at argument that he was aware of no published caselaw at the time he was administered the Thorazine (or, for that matter, since that time), holding that a state is required to conduct a due process hearing prior to the one-time emergency administration of a small dose of a psychotropic drug to an inmate. In contending that Dr. Carter violated clearly established law in ordering administration of the Thorazine without first conducting a predeprivation hearing,[2] Hogan

---

1. Only three days earlier, for example, Hogan had gone into what Dr. Smith described as a "reign of terror." During this "reign of terror," Hogan was administered a 50 mg. dose of Thorazine, which he had requested several hours earlier. The Thorazine immediately calmed Hogan without injury or side effect. J.A. at 74 (affidavit of Dr. Smith).

 Dr. Smith testified that "[i]t is considered appropriate and within the standard of medical care to provide Thorazine IM (intramuscular) when an individual is acutely agitated." *Id.* at 76.

2. Hogan argues alternatively that summary judgment is inappropriate because a material factual

dispute exists as to whether he was actually yelling, kicking, or causing a disturbance, because he claims that on the evening in question, he was talking with two other inmates across the hall while lying on his bed. The record is undisputed, however, that Nurse Butler advised Dr. Carter that Hogan was aggressive, violent, and otherwise uncontrollable. J.A. at 48–49, 55. Since Dr. Carter is the only defendant in this case, and he was entitled to rely on the information provided to him by Butler, there are no material facts in dispute preventing resolution of this case on summary judgment.

relies upon the same authority relied upon by the district court in denying Dr. Carter's motion for summary judgment—the Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), and a number of unpublished opinions from this circuit. Neither *Harper* nor our unpublished caselaw constitutes clearly established law that administration to Hogan of the emergency dose of Thorazine violated Hogan's rights under the Fourteenth Amendment.

In *Harper*, an inmate challenged his involuntary treatment with psychotropic drugs over a period of some three and one-half years while incarcerated at Washington State's Special Offender Center. The Court addressed the questions of whether inmates have a liberty interest in avoiding the administration of antipsychotic drugs against their will and, if so, whether the State of Washington's comprehensive procedures governing the ongoing involuntary administration of such drugs comported with the requirements of due process. As to the first of these issues, the Court held that an inmate does have a constitutionally protected liberty interest in avoiding the involuntary administration of antipsychotic drugs (in addition to any state-created liberty interests), *id.* at 221–22, 110 S.Ct. at 1036–37, but that a state may nonetheless involuntarily treat an inmate who has a serious mental illness with antipsychotic drugs if that inmate is a danger to himself or to others and the treatment is in the inmate's medical interest, *id.* at 227, 110 S.Ct. at 1039–40; *see also Riggins v. Nevada,* 504 U.S. 127, 134–35, 112 S.Ct. 1810, 1814–15, 118 L.Ed.2d 479 (1992). The Court held as to the second issue that the particular array of Washington State's procedures governing the administration of antipsychotic drugs on a continuing basis satisfied the requirements of the Due Process Clause of the Fourteenth Amendment. *Harper,* 494 U.S. at 228, 110 S.Ct. at 1040.

The Court in *Harper* did not have before it, and it did not address, what process might be required before state prison authorities may administer an antipsychotic drug in an emergency circumstance, as opposed to regularly in the course of ongoing, long-term treatment. Indeed, even Justice Stevens, who in dissent would have required the most process prior to the involuntary administration of antipsychotic drugs, specifically observed that the Court had no occasion to consider the State of Washington's separate regulation governing the emergency administration of antipsychotic drugs, pursuant to which state penal authorities were authorized to medicate an inmate involuntarily for up to seventy-two hours in order to prevent imminent harm to the inmate or to others. *See id.* at 246–47, 110 S.Ct. at 1049–50 (Stevens, J., dissenting).

Thus, although *Harper* had clearly established by the time that Dr. Carter ordered administration of the single emergency dose of Thorazine to Hogan that an inmate possesses a liberty interest in avoiding the administration of psychotropic drugs by prison officials, *Harper* had not established, let alone clearly established, the particular process that must precede the one-time administration of an antipsychotic drug in an emergency circumstance such as that confronted by Dr. Carter. Contrary to Hogan's contention, and to the holdings of the district court and panel, *Harper* does not, therefore, constitute clearly established law of which Dr. Carter could have been in violation.

■ In any event, a reasonable jurist [3] or official would likely have concluded from the

---

**3.** In making this observation about the "reasonable jurist" in the context of our qualified immunity inquiry, we are simply noticing, as the Supreme Court itself has recently begun to notice, the doctrinal similarities between the "new rule" and the "qualified immunity" doctrines. *See, e.g., Reynoldsville Casket Co. v. Hyde,* —— U.S. ——, ——, 115 S.Ct. 1745, 1751, 131 L.Ed.2d 820 (1995); *Sawyer v. Smith,* 497 U.S. 227, 236, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990); *Wright v. West,* 505 U.S. 277, 313, 112 S.Ct. 2482, 2501–02, 120 L.Ed.2d 225 (1992) (Souter,

J., concurring in the judgment). Of course, these similarities are not at all surprising, for the two doctrines serve interests similar in principle and they both do so through the same means, by respecting reasonable, contemporaneous judgments based upon then-existing caselaw. Although there might be instances where a reasonable jurist, but not a reasonable official, would consider particular conduct violative of clearly established law, if a reasonable jurist would not have viewed the defendant's action as violative of clearly established law, then it necessarily fol-

principles informing the decision in *Harper* that Hogan received all the process he was constitutionally due under the circumstances. *See generally Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) ("[D]ue process . . . calls for such procedural protections as the particular situation demands."); *Harper*, 494 U.S. at 229, 110 S.Ct. at 1040–41 (citing *Morrissey*, 408 U.S. at 481, 92 S.Ct. at 2600). Here, Dr. Carter, a licensed psychiatrist personally familiar with Hogan, his mental disorder, and his prior treatment, determined, pursuant to and consistent with accepted professional judgment, *see Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982), that it was in Hogan's medical interest to receive the one-time dose of Thorazine in order to protect Hogan from imminent, self-inflicted harm. As the Court held in *Harper*, in the context of prolonged treatment, "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest," 494 U.S. at 227, 110 S.Ct. at 1039–40, and an inmate's interests are "adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals," *id.* at 231, 110 S.Ct. at 1042; *see also id.* at 233, 110 S.Ct. at 1042–43 ("The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals."); *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462 (holding that decisions made by professionals charged with responsibility for the care of mentally retarded are, for purposes of Due Process inquiry, "presumptively valid [and] liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person

responsible actually did not base the decision on such a judgment").

If, in the context of prolonged treatment, an inmate may be involuntarily medicated with an antipsychotic drug if a medical professional determines such medication to be in the inmate's best medical interests, then *a fortiori* the state retains the authority to administer such a drug in an emergency situation based upon the same medical judgment. To the extent that *Harper* can be read as constitutionally requiring full independent review of a medical judgment before administering an antipsychotic drug, we believe that such a holding would be properly understood as addressed to the circumstance of long-term treatment there at issue, and not as extending to emergencies. Otherwise, the state would be obliged, as the district court would have here required, to convene full-scale adversary proceedings at any hour of the night, appoint and retain counsel, subpoena witnesses, and allow for cross-examination—all while the very inmates for whose protection the state is constitutionally responsible remain in danger of injury at their own hands.

Indeed, even Justice Stevens in dissent appeared to recognize that an inmate could be medicated on an emergency basis without a due process hearing, on the strength of a responsible physician's medical judgment that such medication was in the best interest of the inmate, as evidenced by his contrast of the constitutionally distinct penological interests at stake in such a circumstance:

A SOC Policy provision not at issue in this case permits 72 hours of involuntary medication on an emergency basis when "an inmate is suffering from a mental disorder and as a result of that disorder presents an *imminent* likelihood of *serious harm* to himself or others." *In con-*

lows that the reasonable officer likewise would not have viewed that conduct as violative of clearly established law. *See, e.g., Swanson v. Powers*, 937 F.2d 965, 968 (4th Cir.1991) (Wilkinson, J.) ("Since qualified immunity is appropriate if reasonable officers could disagree on the relevant issue, it surely must be appropriate when reasonable jurists can do so." (citation omitted)), *cert. denied*, 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992). As the *en banc* Eleventh

Circuit reasoned in *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149–52 (11th Cir.1994), with which we fully agree, "'[w]e cannot realistically expect that reasonable police officers know more than reasonable judges about the law.'" *Id.* at 1149 n. 8 (quoting *Barts v. Joyner*, 865 F.2d 1187, 1193–94 (11th Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989)).

*trast to the imminent danger of injury that triggers the emergency medication provisions,* a general risk of illness-induced injury or property damage—evidenced by no more than past behavior—allows long-term, involuntary medication of an inmate with psychotropic drugs under Policy 600.30. This ongoing interest in security and management is a penological concern of a *constitutionally distinct magnitude from the necessity of responding to emergencies.*

*Harper,* 494 U.S. at 246–47, 110 S.Ct. at 1050 (Stevens, J., dissenting) (citations omitted) (last two emphases added); *see also Youngberg,* 457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30; *Leeks v. Cunningham,* 997 F.2d 1330, 1335 (11th Cir.) ("[T]he courts having concluded that under certain circumstances the involuntary administration of antipsychotic drugs were violative of due process, did so with an 'emergency exception.'" (citing cases)), *cert. denied,* —— U.S. ——, 114 S.Ct. 609, 126 L.Ed.2d 573 (1993).

The only other judicial authority to which the reasonable jurist or official would have resorted at the time of the incident in question in order to determine whether administration of the Thorazine to Hogan violated clearly established law also suggested that Dr. Carter acted properly in ordering that the drug be administered. In our *en banc* opinion in *Charters,* which predated *Harper* but which was pending on petition for *certiorari* while *Harper* was under consideration by the Court, we had held that due process is satisfied when the decision to medicate an involuntarily committed inmate is, in fact, based upon a doctor's "professional judgment," 863 F.2d 302, 308, 313 (4th Cir.1988) (*en banc*)—the touchstone of due process as ultimately articulated by the Court in *Harper,* 494 U.S. at 231–33, 110 S.Ct. at 1042–43. *See also Youngberg,* 457 U.S. at 322–23 & n. 30, 102 S.Ct. at 2461–62 & n. 30; *Parham v. J.R.,* 442 U.S. 584, 607–09, 99 S.Ct. 2493, 2506–08, 61 L.Ed.2d 101 (1979). The Supreme Court presumably believed *Charters'* "professional medical judgment" standard sufficiently consistent with *Harper's* due process standard that it did not even remand *Charters* for reconsideration in light of *Harper,* but rather denied *certiorari* in the case less than a week after issuing its opinion in *Harper.*

 The only other authorities advanced by Hogan that are even arguably relevant to the specific question of the procedures required in the emergency administration of a psychotropic drug are several unpublished opinions, which not only the district court, but the panel as well, relied upon. Under our own internal rules, unpublished opinions are not precedential; indeed, "[i]n the absence of unusual circumstances," we are bound as a court "not [to] cite an unpublished disposition in any of [our] published opinions or unpublished dispositions." Local Rule 36(c). Since unpublished opinions are not even regarded as binding precedent in our circuit, such opinions cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity. We could not allow liability to be imposed upon public officials based upon unpublished opinions that we ourselves have determined will be binding only upon the parties immediately before the court.

Because Hogan is unable to identify a single precedent prior to the complained of action (or, indeed, any precedent since) that even addressed the procedures constitutionally required before an antipsychotic drug may be administered to an inmate in an emergency, much less an authority holding that a full evidentiary hearing must be conducted before a physician, acting in accordance with sound medical judgment and with the prisoner's best interests in mind, orders the administration of a psychotropic drug in such a circumstance, Dr. Carter is entitled to qualified immunity from the suit brought by Hogan.

If Dr. Carter had not ordered the single dose of Thorazine that he did order, and instead delayed emergency medical intervention until after Hogan had been afforded the predeprivation hearing to which the district court held Hogan was entitled, it is not unlikely that Dr. Carter would now be facing a lawsuit by Hogan claiming that he was deliberately indifferent to his serious medical needs. That Dr. Carter should not be liable

for taking the very action, the failure of which to take could have exposed him to such a lawsuit, should come as no surprise.

The judgment of the district court is reversed, and the case is remanded with instructions to enter judgment for appellant.

*REVERSED AND REMANDED WITH INSTRUCTIONS.*

DIANA GRIBBON MOTZ, Circuit Judge, concurring in the judgment:

I concur in the judgment.

As the majority acknowledges, the "sole question before us ... is whether Dr. Carter violated clearly established law when, in response to the nurse's call during the early morning hours of September 21 informing him that Hogan was in jeopardy of injuring himself, he ordered that Hogan be administered the single emergency dose of Thorazine." Maj. Op. at 1115. I agree with the majority that in September, 1992, neither *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) nor any other case clearly established that Dr. Carter's conduct violated Hogan's rights under the Due Process Clause of the Fourteenth Amendment. *See* Maj. Op. at 1115–1116.

I write separately to emphasize that this is the only holding of the case. The conclusion that no case had established the extent of the process to which Hogan was entitled under the circumstances, and therefore a person in Dr. Carter's position surely could not have known of the process required, resolves the qualified immunity question presented in this appeal. Thus, there is no need to opine: (1) what a "reasonable jurist" would have "resorted to" in considering whether Dr. Carter's conduct in fact violated Hogan's rights, Maj. Op. at 1117, 1118; (2) whether our opinion in *United States v. Charters*, 863 F.2d 302 (4th Cir.1988) (*en banc*), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990), survives the Supreme Court's *Harper* decision, Maj. Op. at 1118 (particularly in view of the majority's initial conclusion that caselaw involving "non-emergency" situations had no bearing on Dr. Carter's right to qualified immunity, Maj. Op. at 1116); or (3) whether it is "not unlikely" that

if Hogan had been afforded the hearing to which the district court held he was entitled, "Dr. Carter would now be facing a lawsuit by Hogan claiming that he [Dr. Carter] was deliberately indifferent to his [Hogan's] serious medical needs." Maj. Op. at 1118. The discussion of these issues is unnecessary for the decision in this case and, as such, is mere dictum.

K.K. HALL, MURNAGHAN, ERVIN, and MICHAEL, JJ., join in this opinion.