Glenn L. **DANCY**

*v.*

Secretary Stuart O. **SIMMS**, et al.

No. CIV.JFM–98–1060.

United States District Court,
D. Maryland.

Sept. 15, 2000.

Jonathan P. Kagan, Brassel & Baldwin, Annapolis, MD, for Plaintiff.

Stephanie Judith Lane–Weber, J. Joseph Curran, Jr., Sharon Stanley Street, Angela M. Eaves, Office of the Attorney General, Karl Joseph Nelson, Kramon & Graham, P.A., Baltimore, MD, Donald J. Crawford, Godard, West & Adelman, Rockville, MD, for Defendants.

## MEMORANDUM

MOTZ, District Judge.

In this action, Plaintiff Glenn L. Dancy claims violations of 42 U.S.C. § 1983, the Maryland State Constitution, and state tort law prohibiting negligence and battery. Dancy has sued various state prison officials and health care providers for forcibly administering antipsychotic medication without his consent on twenty-two separate occasions. Defendants EMSA Correctional Care, Inc. ("EMSA"), Correctional Medical Services, Inc. ("CMS"), Dr. Ferdinand Massari, Secretary Stuart Simms, Director Joseph Henneberry, Commissioner Richard Lanham, Sr., Warden Archie Gee, Captain Terrence Davis, and Lieutenant Keith Green have filed motions for summary judgment.[1] The motions will be granted.

---

1. Because I have considered materials outside of the pleadings, EMSA's motion to dismiss was automatically converted to a motion for summary judgment pursuant to the federal rules. *See* Fed.R.Civ.P. 12(b). Therefore, the well settled principles of summary judgment apply to all the motions. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## I.

Dancy is an inmate at a maximum security correctional facility, Patuxent Institution ("Patuxent"), located in Jessup, Maryland. He has been diagnosed with paranoid schizophrenia. Between December 1995 and January 1998, on twenty-two separate occasions, Dancy was involuntarily medicated with antipsychotic drugs such as Haldol and Prolixin. Dancy was not given any prior notice of or afforded an opportunity to challenge in an adversarial hearing these forcible medication orders. During this period, there was no written policy effective at Patuxent that provided for either administrative or quasi-judicial safeguards in determining whether the involuntary injections were warranted. There was, however, a Department of Public Safety and Correctional Services ("DPSCS") policy, DCD/PID # 124–004, and an internal health directive stating that psychiatric illness could be medicated, over objection, if the treatment was for the health and safety of the inmate or others and was clinically appropriate.

EMSA and CMS are private corporations that have contracted with the State of Maryland to provide medical services to inmates at certain state institutions, including Patuxent. Dr. Massari served as a staff psychiatrist for CMS at Patuxent from 1992 to 1997 and was involved in at least nine of Dancy's forcible medication orders. Secretary Simms, Director Henneberry, Commissioner Lanham, Sr., and Warden Gee are all Maryland state prison officials responsible for Patuxent. Captain Davis and Lieutenant Green assisted in carrying out the orders to forcibly medicate Dancy by physically restraining him.

Defendants maintain that each time Dancy was involuntarily injected with antipsychotic medication he was exhibiting behavior that was dangerous to himself or others. Dancy's behavior in these situations included flooding the tier, using the bed frame to pound on the wall and floor, banging a loose bolt against metal plumbing, and throwing urine and feces at others. According to defendants, each time emergency medication was given it was deemed medically necessary and was ordered by a psychiatrist who was either present or contacted by phone.

## II.

■ In order to establish a claim under § 1983, plaintiffs must show "that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Manufacturers Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). The "under color of state law" requirement is met when the deprivation was caused "by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible" and the person responsible "may fairly be said to be a state actor."[2] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Here, none of the defendants dispute that they acted under color of state law.

■■ The Supreme Court determined that an inmate possess "a significant liberty interest in avoiding unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221–22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). However, the inmate's constitutional right to be free from unwanted medication must be evaluated in light of his confinement. *See id.* at 222, 110 S.Ct. 1028. Due to the necessities of incarceration, violations of fundamental rights, if justified by legitimate penological

---

**2.** Where, as here, deprivations of rights under the Fourteenth Amendment are alleged, the Fourteenth Amendment's state action requirement and the § 1983 requirement of "under color of state law" converge. *See American Mfrs. Mut. Ins. Co.*, 526 U.S. at 50 n. 8, 119 S.Ct. 977.

interests, may not support constitutional claims. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Therefore, the Court has held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Harper,* 494 U.S. at 227, 110 S.Ct. 1028.

In defining the contours of this substantive constitutional right, the Court also analyzed the procedural rights necessary to protect the inmate's liberty interest. Of course, "[i]t is axiomatic that procedural protections must be examined in terms of the substantive rights at stake." *Id.* at 220, 110 S.Ct. 1028. The inmate in *Harper* was objecting to the forcible, ongoing, and long-term treatment of his mental illness with antipsychotic drugs. *See id.* at 214, 110 S.Ct. 1028. In that context, the Court found that the state's policy granting the nonconsenting inmate a hearing before a special medical committee sufficient to protect the inmate's procedural due process rights. *See id.* at 228, 110 S.Ct. 1028. The Court, however, left open the question of what due process was required in emergency circumstances. *See id.* at 246, 110 S.Ct. 1028 (Stevens, J., dissenting) (stating that a policy "not at issue in this case permits 72 hours of involuntary medication on an emergency basis").

In *Hogan v. Carter,* 85 F.3d 1113 (4th Cir.1996), the Fourth Circuit found that while "*Harper* can be read as constitutionally requiring full independent review of a medical judgment before administering an antipsychotic drug, we believe that such a holding would be properly understood as addressed to the circum-

stance of long-term treatment there at issue, and not as extending to emergencies." 85 F.3d at 1117; *see also Leeks v. Cunningham,* 997 F.2d 1330, 1335 (11th Cir. 1993) ("[T]he courts having concluded that under certain circumstances the involuntary administration of antipsychotic drugs were violative of due process, did so with an 'emergency exception.'"). Instead, the court in *Hogan* reiterated the due process standard articulated in *United States v. Charters,* 863 F.2d 302 (4th Cir.1988).[3] In *Charters,* the Fourth Circuit stated that:

> [i]t is therefore settled that in appropriate circumstances government may properly commit base-line decisions to "deprive" persons of certain liberty (or property) interests to appropriate professionals exercising their specialized professional judgments rather than to traditional judicial or administrative-type adjudicative processes. This occurs when the conflicting interests—individual and governmental—can only be assessed in those terms, and even when, as is usual, the exercise of professional judgment necessarily involves some interpretation of the disputable "meaning" of clinical "facts."

863 F.2d at 308. Quite simply, the decision to administer antipsychotic medication over an inmate's objection comports with due process if the decision was made in the exercise of professional medical judgment and arose in the context of an emergency situation where the inmate posed a danger to himself or others. *See Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984) ("Any decision to administer antipsychotic drugs forcibly must be the product of professional judgment by appropriate medical authorities, applying accepted medical standards.").

---

3. In an unpublished decision, *Hogan v. Carter,* No. 94–7037, 1995 WL 674574, at *3 (4th Cir. Nov. 14, 1995), *rev'd en banc,* 85 F.3d 1113 (4th Cir.1996), the court suggested that *Charters* was no longer valid law after *Harper.* The Fourth Circuit's subsequent opinion in *Hogan* disagreed finding *Charters* still applica-

ble. *See Hogan,* 85 F.3d at 1118; *see also United States v. Morgan,* 193 F.3d 252, 262 (4th Cir.1999) ("[T]his court has indicated that the 'professional judgment' standard established in *Charters* remains viable even after the Supreme Court's decision in *Harper.*").

### III.

■ In the present case, Dr. Massari stated unequivocally that Dancy was forcibly medicated only when "it was determined as a matter of sound medical judgment that Dancy posed an imminent danger to himself or others.... Upon considering the behavior and Dancy's history, a professional, medical determination was made on each occasion that Dancy posed an imminent danger to himself or others."[4] Massari Aff. ¶¶ 7–8. Indeed, in almost every incident the physicians' orders themselves report that Dancy was only medicated without consent in emergencies when his behavior was "dangerous," "destructive," or "injurious" to himself or others. Pl.'s Opp'n to CMS, Ex. A. Moreover, the medical progress notes, often in a more explicit account, reaffirm that Dancy was acting in a violent and dangerous manner in nearly every case. Nurse Bageant also declared in his affidavit that "[f]or each date cited by plaintiff in which he allegedly was forcibly medicated, the medical records show that Mr. Dancy was exhibiting behavior that was dangerous to himself or others." Bageant Aff. ¶ 5. In addition, under DPSCS policy and internal procedures, an inmate could only be forcibly medicated for the "health and safety" of the inmate or others, and the treatment was deemed "clinically appropriate." Defs.' (Simms, et al.) Mot.

Summ. J. Ex. 2, 3. Clearly, the professional judgments of Dancy's health care providers and the emergency medication policies established by prison officials complied with the standard articulated in *Charters*.

In opposition, Dancy disputes that there really were medical emergencies in each and every instance that necessitated his being forcibly injected with antipsychotic medication. In his affidavit, Dancy attested that "I was never a danger to myself or anyone else.... Further, I was confined to my cell and not permitted to interact with the other inmates, and thus, at no time a danger to myself or others." Dancy Aff. ¶¶ 8–9. Specifically, Dancy also claims that three of the forcible medication orders did not make any representation of emergency situations that would permit the defendants to dispense with his independent hearing rights under *Harper*. The January 3, 1997, November 28, 1997, and December 1, 1997, orders read that Dancy should be medicated over his objection merely "if the patient refuses" his routine oral medication. Pl.'s Opp'n to CMS, Ex. A.

■ Nevertheless, Dancy's general denial of being "dangerous" is insufficient to generate an issue of material fact. Nowhere in his affidavit does he contest the factual evidence about particular incidents where his behavior was abusive, self-injurious, or violent.[5] Furthermore, he pro-

---

**4.** There appears to be some confusion about when the twenty-two involuntary medications occurred. In the third amended complaint, Dancy attached a chart summarizing the physicians' orders by date, medication, dosage, doctors or nurses involved, and reasons given for each forcible medication. *See* Pl.'s Third Am. Compl. Ex. A. CMS and Dr. Massari, however, also submit a table of the dates, time, and reasons given for forcibly medicating Dancy. *See* Defs.' (CMS and Masari) Mot. Summ. J. Ex. A. Apparently, these incidents summarize the progress notes. However, between the two charts, only thirteen of the dates actually coincide. Thus, it seems that Dancy was medicated without giving consent more than twenty-two times between December 1995 and January 1998. Perhaps, to the parties engaged in the course of extended and

intensive discovery, the reason for the differences is obvious. Inexplicably, however, none of the parties make any effort in their motions to try and clarify these discrepancies. Therefore, I will only consider the twenty-two incidents on the twenty separate dates (on two dates, October 13, 1997 and January 9, 1998, Dancy states that he was involuntarily medicated twice) alleged in the final complaint. Still, I remain troubled by the lack of diligence shown by both sides in investigating and explaining the incongruity.

**5.** *Cf. Hogan,* 1995 WL 674574, at *3 (finding genuine dispute as to material facts where inmate claimed he was talking to two inmates across the hall, but nurse said he was yelling, kicking, and being abusive in his cell).

duces no professional medical evidence to challenge Dr. Massari's and the other treating physicians' opinions regarding the unwanted injections. *See Bee,* 744 F.2d at 1395–96 ("Determining that an emergency exists sufficient to warrant involuntary medication with this type of drug requires a professional judgment-call"). Whether Dancy's unruly conduct, as a diagnosed paranoid schizophrenic, constituted a legitimate emergency requiring forcible medication is a uniquely medical question. So, without expert medical opinion, Dancy is unable to create a genuine issue for trial. *See, e.g., S.B. Thomas Inc. v. Thompson,* 114 Md.App. 357, 689 A.2d 1301, 1307 (1997) (affirming decision that a complex medical question required expert medical testimony). Accordingly, an affidavit, such as Dancy's, "that is wholly conclusory, and devoid of reasoning does not comply with the Fed.R.Civ.P. 56(e)." *M & M Med. Supplies and Serv., Inc. v. Pleasant Valley Hosp.,* 981 F.2d 160, 165 (4th Cir.1993).

Dancy's reliance on the physicians' orders dated January 3, 1997,[6] November 28, 1997, and December 1, 1997, is also unavailing. The contemporaneous progress notes clearly undermine Dancy's contention that he was not dangerous. For instance, on November 28, 1997 the progress notes report that Dancy was "rapidly decompensative" and after refusing medication "became very belligerent and verbally threatening and aggressive. He is not able to modulate his emotions and has very little control over his aggressive behavior." Def. EMSA's Reply Ex. A. In addition, the December 1, 1997 progress notes state that the "patient continues to have potentially dangerous behavior and continues to meet the indications for involuntary medication." *Id.* His general and conclusory affidavit does nothing to contest this underlying medical documentation. Therefore, looking at the totality of the circumstances, these three orders, without more, are insufficient to withstand the motions for summary judgment.

In the alternative, Dancy maintains that, regardless of whether the forcible medication occurred in an emergency context, twenty-two injections over two years is ongoing and long-term care, which requires a due process hearing under *Harper.* However, the situation here is substantively different. In *Harper,* the inmate sought the complete cessation of prolonged treatment with antipsychotic drugs for his mental illness. *See Harper,* 494 U.S. at 214, 110 S.Ct. 1028; *Hogan,* 85 F.3d at 1116. In this case, Dancy objects to isolated administrations of the antipsychotics, but not the general long-term use of these drugs in the treatment of his schizophrenia. Thus, in his complaint, he does not seek to have his ongoing, long-term treatment with antipsychotic drugs terminated. Instead, he asks for monetary damages and injunctive relief enjoining the defendants from further enforcement of DCD/PID # 124–004 without additional procedural safeguards. Instead, in response to his sporadic refusals, the state prison officials and medical providers have chosen to wait until either he consents to the oral medication or he becomes destructive. *See* Bageant Aff. ¶ 4. Although perhaps this is not an ideal policy, it is, nonetheless, clearly constitutional.

■ Finally, the defendant's decision not to transfer Dancy to Clifton T. Perkins Hospital, a maximum security facility that handles long-term, forcible medication for severely mentally disabled inmates, is not constitutionally cognizable. *See, e.g., Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Paoli v. Lally,* 812 F.2d 1489 (1987). Generally, Perkins Hospital is reserved for inmates not responding well to treatment. *See* Bageant Aff. ¶ 6. Dancy, however, was usually compliant with taking his prescribed antipsychotic medication and responded well to treatment. *See* Bageant Aff. ¶ 4. Therefore,

---

**6.** The January 3, 1997 physician's order also bears a second date, January 3, 1998. There-

fore, it is somewhat unclear if this incident occurred at the beginning of 1997 or 1998.

Dancy's argument concerning his failure to be transferred also fails.

 Summary judgment is appropriate only after "adequate time for discovery." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Counsel for Dancy, who was appointed in December 1998, has provided no evidence to suggest that summary judgment is premature. The Fourth Circuit has made it clear that a "party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit." *Nguyen v. CNA Corp.,* 44 F.3d 234, 242 (4th Cir.1995). Therefore, the defendants' motions for summary judgment should not be delayed by an unsupported request for additional discovery.

Because I have granted summary judgment as to the § 1983 claims and because the legal issues raised by the remaining claims are peculiarly ones of state law properly to be considered by the Maryland courts, I decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).[7]

For these reasons, the summary judgment motions of defendants EMSA, CMS, Dr. Massari, Secretary Simms, Director Henneberry, Commissioner Lanham, Sr., Warden Gee, Captain Davis, and Lieutenant Green are granted. A separate order to that effect is being entered herewith.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this *15th* day of September, 2000

ORDERED that

1. Defendants' motions for summary judgment are granted; and

2. Judgment is entered in favor of defendants against plaintiff.

---

[7] Moreover, I need not consider the other defenses raised to § 1983 liability such as qualified immunity and the unavailability of *respondeat superior.*