# United States Court of Appeals
### For the Eighth Circuit

_____

No. 11-2251

_____

Timothy Green

*Plaintiff - Appellant*

v.

Dave Dormire; Arthur Wood; Bill Galloway; Dr. Robert E. Holland; Kay Redding, Dept. of Mental Health; Department of Mental Health of the State of Missouri; Greg Boyt, Dept. of Mental Health; Sally Taylor, Dept. of Mental Health; Allen Heald, Dept. of Mental Health; Jim Bennett, Dept. of Mental Health; Mariann Atwell; Missouri Department of Corrections; Jerry Doty; Ellis McSwain; William Eikermann; Mark W. Schmitz; Dr. Felix Vincenz; Joe Mangini; Bruce Harry; Stephanie Scott; Kay Smith; Jeanne Henry; Debra Lewis; David Stephens; A. E. Daniels

*Defendants - Appellees*

Ed Cullumber; Dr. Gulley; Dr. Loehr; Dr. Rawlani; Shelley Moore

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: June 15, 2012
Filed: September 4, 2012

_____

Before LOKEN, GRUENDER, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Timothy Green, an inmate of the Missouri Department of Corrections, was transferred from the Jefferson City Correctional Center (JCCC) to the Biggs Correctional Treatment Unit at the Fulton State Hospital (Biggs). There, he was involuntarily medicated. Green sued under 42 U.S.C. § 1983, alleging that his transfer, detention, and involuntary medication violated his Due Process rights. The district court[1] granted summary judgment to the defendant prison officials and doctors. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

In September 2003, Green was placed in the administrative segregation unit at JCCC for two weeks. Released from administrative segregation, he began to exhibit delusional behaviors based on his belief that a device had been planted in his television, allowing celebrities to watch and communicate with him and to wear fashions he designed without his permission. This belief led him to write multiple letters to various celebrities. Dr. Robert E. Holland diagnosed Green with Delusional Disorder and prescribed medication to treat it. Green refused to take the medication because he did not believe he had delusions.

Due to his refusal to take medication, Green was moved from JCCC to Biggs, which is jointly operated by the Missouri Department of Corrections and the Missouri Department of Mental Health. Defendant Dave Dormire, the chief administrative officer of JCCC, did not certify, before the transfer, that Green needed treatment.

Green was at Biggs for 33 days. He saw a number of mental health professionals who evaluated him and created treatment plans. One week after his arrival at Biggs, the mental health staff, at a treatment hearing that Green attended,

---

[1]The Honorable Nanette K. Laughrey, United States District Court for the Western District of Missouri.

outlined his treatment goals and objectives. At that meeting, a consulting psychologist recommended that Green take antipsychotic medication.[2] Green refused.

Two days later, another hearing convened to determine whether Green should be involuntarily medicated. Attending were a consulting psychiatrist, a psychologist, a physician, a social worker, a regional manager of Mental Health Services, an associate superintendent, and Green's two lay advocates. Green spoke during the hearing. Other attendees asked him questions and expressed their opinions about his mental health.

At the conclusion of the hearing, a committee composed of the consulting psychiatrist, the associate superintendent, and the regional manager of Mental Health Services determined that Green was gravely disabled and not able to function in prison or in the general population without control of his Delusional Disorder through medication. Thus, the committee determined that Green required involuntary medication.

Green appealed. The Chief of Mental Health Services, after reviewing the hearing record and Green's progress notes, found it clinically necessary to administer involuntary medication. Green was forcibly medicated for seven months.

Green sued, arguing that his federal Due Process rights were violated when he was (1) moved from JCCC to Biggs without certification by the warden and retained for more than 96 hours without judicial certification (in alleged violation of a state statute), and (2) was forcibly medicated. Green renews these arguments on appeal.

---

[2]Antipsychotic drugs, also known as "neuroleptics" or "psychotropic drugs," are commonly used to treat mental disorders, but can have "serious, even fatal, side effects." *Washington v. Harper*, 494 U.S. 210, 229 (1990).

This court reviews de novo the district court's grant of summary judgment, viewing all evidence and drawing all reasonable inferences in favor of the non-moving party. *Crawford v. Van Buren County, Ark.*, 678 F.3d 666, 669 (8th Cir. 2012). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. **Fed. R. Civ. P. 56(a)**.

I.

The district court ruled that Green's transfer did not violate section 552.050.1 RSMo,[3] which provides:

> If the chief administrative officer of any correctional facility has reasonable cause to believe that any offender needs care in a mental hospital, he shall so certify to the division of classification and treatment, which shall then transfer the offender to a state mental hospital for custody, care and treatment. The hospital may detain and treat the offender for a period of time not to exceed ninety-six hours.

After the 96-hour period ends, "the offender shall be returned to a correctional facility designated by the department of corrections unless the individual admits himself as a voluntary patient or the mental health coordinator or head of the facility files for involuntary detention and treatment . . . ." **§ 552.050.1 RSMo**. Any continued involuntary detention must comply with section 632.330 RSMo, which grants specific rights to the detainee. The district court found that Green was not transferred to a state mental hospital because he "remained in a correctional facility at all times," and thus that the Missouri statutes "never came into play." At issue, however, is not whether the statutes were violated but rather whether the minimum requirements of Due Process are satisfied.

---

[3]RSMo refers to the Missouri Revised Statutes, 2000, as amended.

Green argues that his relocation to and detention at Biggs violated a State-created liberty interest. "[S]tate statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Vitek v. Jones*, 445 U.S. 480, 488 (1980) ("[O]nce a State grants a prisoner [a] conditional liberty properly dependent on the observance of special . . . restrictions, due process protections attach."). When a liberty interest is present, the minimum requirements of Due Process are established by federal law, not by state statute. *Id.* at 491.

Temporary transfers to mental-health facilities for evaluation do not give rise to the liberty interest protected in *Vitek*. *United States v. Jones*, 811 F.2d 444, 448 (8th Cir. 1987); *Gay v. Turner*, 994 F.2d 425, 427 (8th Cir. 1993) (per curiam); *Trapnell v. Ralston*, 819 F.2d 182, 184-85 (8th Cir. 1987). *Vitek* addressed a statute authorizing the "indefinite commitment" of an inmate to a mental-health facility. *Jones*, 811 F.2d at 448. "Thus, the court's reliance on the stigma attached to a commitment and the behavioral modification procedures utilized at the facility, on which the court substantially relied in finding a protected liberty interest, has no application to [a case concerning a temporary transfer for evaluation]." *Id.* Other circuits follow this court's precedent. *See, e.g.*, *Fortune v. Bitner*, 285 F. Appx. 947, 950 (3d Cir. 2008) (per curiam) (unpublished); *Fant v. Fed. Bureau of Prisons*, No. 93-5059, 1993 WL 318888, at *1 (D.C. Cir. 1993) (per curiam) (order).

Green argues that he was transferred for treatment and not evaluation. Green's behavior required some sort of segregation, and prison officials transferred him to Biggs. A temporary transfer to a mental-health facility for evaluation does not burden an inmate any more than a prison transfer for administrative purposes. *See Jones*, 811 F.2d at 448 (discussing the great leeway given to prison officials to transfer inmates – even into more restrictive conditions – without implicating a liberty interest). After being evaluated, Green received sufficient process (including a treatment hearing) within seven days of arriving, and before any involuntary

medication. The district court properly granted the defendants' motion for summary judgment as to Green's transfer.

## II.

Green claims that his involuntary medication violated his substantive Due Process rights. Prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." **Washington v. Harper**, 494 U.S. 210, 222 (1990).

## A.

Green argues that, as a general proposition, the Due Process Clause requires that he be found dangerous before he may be involuntarily medicated. The committee assembled for the Due Process hearing concluded that Green was "gravely disabled to the extent he would not be able to function in prison or in the population upon release without control of his delusional disorder." Citing *United States v. McAllister*, 969 F. Supp. 1200, 1207-08 (D. Minn. 1997), Green argues that "[i]f the 'gravely disabled' language in the [Policy] were not read to require a showing of dangerousness within the institution, the [Policy] would be unconstitutional under the Due Process Clause." True, *Harper*'s specific holding is that Due Process allows an inmate to be treated "if [he] is dangerous to himself or others" and (2) when "the treatment is in the inmate's medical interest." **Harper**, 494 U.S. at 227. The *Harper* opinion does not make these criteria the only basis for involuntary medication. *See id.* at 227 (holding that the "Due Process Clause permits the State to treat a prison inmate . . . with antipsychotic drugs against his will" under certain circumstances, while not limiting treatment to those circumstances). The Supreme Court has explained that an "overriding justification and a determination of medical appropriateness" may justify the forced administration of "antipsychotic drugs on a convicted prisoner." **Riggins v. Nevada**, 504 U.S. 127, 135 (1992) (involuntary

-6-

medication during trial is permissible where "medically appropriate and, considering less intrusive alternatives, essential for the sake of [a defendant's] own safety *or* the safety of others" (emphasis added)).

In *Harper*, the Supreme Court also held that Washington's policy for the involuntary medication of inmates comported with the requirements of Due Process. ***Harper***, 494 U.S. at 227. That policy allowed an inmate to be subjected to involuntary medication "if he (1) suffers from a 'mental disorder' and (2) is 'gravely disabled' *or* poses a 'likelihood of serious harm' to himself, others, or their property." ***Id.*** at 215 (emphasis added). The disjunctive demonstrates that "gravely disabled" does not include dangerousness. Washington's definition confirms this; someone who is "gravely disabled" may "manifest[ ] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." ***Id.*** at 215 n.3.

Like Washington's policy, Missouri's Policy allows involuntary medication when an inmate's "mental illness interferes with [his] functioning in the institution, yet no immediate danger exists. This includes those who are gravely disabled *or* pose a future likelihood of harm to self or others if treatment is not instituted." (Emphasis added). Under Missouri's Policy, the gravely disabled include those who, like Green, are "the psychotic offender who evidences delusions, hallucinations or other thought disturbances" and those who suffer from "severely diminished institutional adjustment." Green need only be found gravely disabled before he may be involuntarily medicated.[4]

---

[4]While dangerousness is not required to comply with *Harper*, Green's dangerousness was the focus of the committee's discussion when it made its determination. Although committee members believed Green was not an imminent danger, they felt that his "delusional system will feed to that at a later time," that he "could become a stalker," and that he was beginning to project his sense of loss of

B.

Green contends that his liberty interest in avoiding involuntary medication was expanded by Missouri Department of Corrections Policy IS12-6.1, and that this substantive right was violated. Green claims that Policy IS12-6.1 allows the involuntary administration of antipsychotic medication only when, based upon the opinion of a psychiatrist or a physician in conjunction with another mental health profession, (1) an inmate's symptoms "are determined to be a clinical emergency," and (2) alternative methods are not sufficient or suitable. As defined by Policy IS12-6.1, a "clinical emergency" is limited to "cases where an offender is demonstrating symptoms of acute mental disorder resulting in the offender being considered imminently dangerous to self or others." Green argues that, because neither the committee assembled for his Due Process hearing nor the chief of mental health services found that a clinical emergency existed, his treatment violates Policy IS12-6.1.

To the contrary, the Policy does not limit involuntary medication to a "clinical emergency." The Policy also allows involuntary medication in cases of "clinical necessity." A "clinical necessity" occurs when "mental illness interferes with [an inmate's] functioning in the institution, yet no immediate danger exists. This includes those who are gravely disabled or pose a future likelihood of harm to self or others if treatment is not instituted" and includes inmates who evidence "delusions, hallucinations or other thought disturbances." "Clinical necessity" was the basis for Green's involuntary medication.

Green interprets the Policy's language to require a "clinical emergency" before a "clinical necessity" allows forced medication. He relies on the structure of the

---

control on others, a sign that a loss of control "is likely to happen at some time." *See Harper*, 494 U.S. at 232 (a court should not second-guess the findings of trained medical professionals).

Policy, which outlines the two standards, places clinical emergency before clinical necessity, and states: "When the continued involuntary administration of [antipsychotic] medication is a clinical necessity, a clinical due process hearing should occur." According to Green, the word "continued" implies an uninterrupted administration of medication from a previous emergency.

Green's interpretation is incorrect. The Policy sets forth two independent avenues for involuntary medication. A clinical emergency occurs when an inmate poses an imminent threat to himself or others, and immediate action is required. The Policy allows prison officials immediately to medicate the inmate, without a due process hearing (based on the opinion of a psychiatrist or a physician in conjunction with another mental health professional). *See Hogan v. Carter*, 85 F.3d 1113, 1117-18 (4th Cir. 1996) (en banc) (holding that *Harper* allows prison officials to dispense with minimum Due Process requirements during emergencies in order to involuntarily administer antipsychotic drugs). According to Missouri's Policy, once the "emergency has abated, [if] the psychiatrist or physician believes that involuntary medication is still warranted, a clinical due process hearing should be arranged."

The Policy has an alternative avenue for involuntary medication: clinical necessity. The Due Process Clause does not require that an inmate's mental state become an emergency before involuntary treatment may be imposed. *See Riggins*, 504 U.S. at 135 (holding that inmates may be involuntarily medicated when there is an overriding justification). The "clinical necessity" applies to non-emergency situations. These two standards reflect the Government's legitimate interest "in treating [Green] where medically appropriate for the purpose of reducing the danger he poses," *Harper*, 494 U.S. at 226, and the idea that "[t]he extent of a prisoner's right under the [Due Process] Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement," *id.*

at 222. Green's involuntary medication for a clinical necessity did not violate Policy IS12-6.1, or his Fourteenth Amendment Due Process rights.

## III.

Green's right to avoid involuntary medication is protected by minimum procedural Due Process requirements. *See **Harper***, 494 U.S. at 228. In *Washington v. Harper*, the Supreme Court held that the procedural protections in Washington's policy for the involuntary administration of antipsychotic drugs met the requirements of Due Process. *Id.* at 228. That policy included: (1) a hearing ; (2) a neutral and detached trier of fact; (3) notice; (4) the inmate's right to be present at the adversarial hearing; (5) the inmate's right to cross-examine witnesses; and, (6) the right to appeal. *Id.* at 228, 231, 235.

Green's procedural rights were not violated. The Department of Corrections' policy for the involuntary administration of antipsychotic drugs, Policy IS12-6.1 closely follows Washington's policy approved in *Harper*. Before his forced treatment, Green was given notice of his Due Process hearing, was present at it, and was permitted to cross-examine witnesses. A neutral decisionmaker made the decision, which Green appealed.

## IV.

In view of the discussion above, this court need not address Green's arguments that the district court should have appointed counsel for him, or that qualified immunity does not apply in this case.

**************

-10-

The judgment of the district court is affirmed.

_____